**Susan L. FALLINI, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 92–809L.**

United States Court of Federal Claims.

April 4, 1994 *.

---

* This order was filed unpublished on March 11, 1994, and judgment was entered March 15, 1994. Thereafter defendant filed a motion for

publication. Pursuant to RCFC 52.1(b) defendant's motion was allowed on April 4, 1994, and the order is reissued for publication this date.

William F. Schroeder and W. Alan Schroeder, for plaintiffs.

Dorothy R. Burakreis and Laura Brown, Dept. of Interior, for defendant.

## ORDER

HARKINS, Senior Judge.

Pursuant to order, oral argument on defendant's motion for summary judgment was heard on February 17, 1994, in the United States Court of Federal Claims, National Courts Building, Washington, D.C.

Relevant Papers:

Complaint, filed November 24, 1992

Answer, filed March 1, 1993

Defendant's Motion for Summary Judgment, with separately bound Appendix, filed June 3, 1993

Defendant's Proposed Findings of Uncontroverted Fact, filed June 3, 1993

Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, with separately bound Appendix (6 volumes, 1516 pages), filed September 1, 1993

Plaintiffs' Statement of Genuine Issues, filed September 1, 1993

Defendant's Reply in Support of Its Motion for Summary Judgment, filed September 28, 1993

Defendant's Supplemental Appendix in Support of Its Motion for Summary Judgment, filed September 28, 1993

Plaintiffs' Outline of Oral Argument on Defendant's Motion for Summary Judgment, filed pursuant to court order, February 17, 1994

At the close of argument, a bench ruling was made. The reasons for the decision were stated on the record and portions of defendant's June 2, 1993, motion for summary judgment, and September 8, 1993, reply were identified and adopted.

Plaintiffs operate a desert cow/yearling ranch operation utilizing an area of public lands known as the Reveille Allotment, Nye County, Nevada. Plaintiffs' ranching operation includes 2,700 acres of private land, generally known as Twin Springs Ranch, that are intermingled with the public lands in the Reveille Allotment. The Reveille Allotment,

administered by the Bureau of Land Management (BLM), Department of the Interior, is comprised of 657,520 acres. According to defendant, the Reveille Allotment contains a total of 57 developed water sources, and at least 47 undeveloped water sources.

Plaintiffs' ranch operation is of ancient origin. The most recent grazing permit, approved September 11, 1984, authorizes grazing on 657,520 acres of the Allotment, with a preference of 25,730 Animal Unit Months (AUMs). An AUM is defined as (1) the amount of feed required by an animal unit (one mature 1,000 lb. cow or equivalent) for one month, or (2) tenure of one animal unit for a period of one month. The Reveille Allotment is a desert area, and the grazing preference in AUMs is contingent on base waters controlled by the permittee. A base water is a water on federal land for which the permittee has a water right under state law, and which has been determined to support a certain number of AUMs. Range improvement permits allow development of water sources additional to base waters, but do not increase the number of permitted AUMs.

Since 1969, plaintiffs' grazing permits have permitted a total of 25,730 AUMs (approximately 2,144 head of mature cattle). Since 1976, the actual use in ranch operations has been at the full preference, 25,730 AUMs.

Prior litigation in 1986 by plaintiffs has established a herd management area (HMA) for wild horses on the Reveille Allotment that is based on historic location of wild horses. The geographic boundaries of the HMA, and the herd population, were established by the court on the basis of a stipulation of the parties. *Fallini v. Hodel*, Civ. No. R 85–535 BRT. (D.Nev. Nov. 13, 1987). The HMA is comprised of 125,445 acres located within the Allotment, and there is and will continue to be only one wild horse herd use area within the Reveille Allotment. The HMA is to be managed for a herd population of between 145 and 165 wild horses. The stipulation provides that an annual census of the whole Reveille Allotment is required to be taken by the BLM, and written notice of the results of the census shall be sent to

plaintiffs within 30 days of completion. Should a population of over 165 horses be determined to exist within the whole of the Reveille Allotment, BLM is required to remove the excess horses within 120 days. Should public range lands within the Reveille HMA substantially deteriorate, BLM retains discretion under applicable statute or regulation to make adjustments in the multiple uses of the Reveille HMA.

Defendant contends that since the 1986 litigation and entry of the stipulated judgment in 1987, BLM has conducted the required annual census and has removed the excess horses. BLM statistics show wild horse data as follows:

|      | Census | Removed | Remaining |
|------|--------|---------|-----------|
| 1986 | 1300   |         |           |
| 1987 | 1495   | 1214    | 281       |
| 1988 | 370    | 238     | 132       |
| 1989 | 269    | 105     | 164       |
| 1990 | 185    | 47      | 138       |
| 1991 | 195    | 54      | 141       |

In the complaint, plaintiffs contend that BLM, through its management of wild horses on the Reveille Allotment, has taken water owned by plaintiffs. Plaintiffs seek to recover the cost of producing the water that has been consumed by the wild horses. The complaint asserts claims for water consumed between 1972 and 1991 by wild horses (a) managed by BLM in excess of the numbers authorized by law ($757,922), and (b) managed by BLM within lawful limits ($160,324).

Alternatively, the complaint asserts claims for water consumed between 1987–1991 by wild horses (a) managed by BLM in excess of the numbers authorized by law ($94,204), and (b) managed b BLM within lawful limits ($69,900).

The total amount claimed for the 1972–1991 period is $918,246. The total amount claimed for the alternative 1987–1991 period is $164,104.

The complaint provides statistical data relative to water demand by wild horses that includes the following:

## WATER DEMAND—WILD HORSES

| Year | Horses | Allowed* | Horse Water Demand (gal. per year) | | Total Water Demand** | % Horses | |
|---|---|---|---|---|---|---|---|
| | | | Total | Over Legal No. | | Total | Over Legal No. |
| 1971 | 126 | | 551,880 | | 6,665,630 | 8% | |
| 1972 | 178 | 165 | 779,640 | 56,940 | 7,988,390 | 10% | 1% |
| 1973 | 238 | 165 | 1,042,440 | 319,740 | 8,868,648 | 12% | 4% |
| 1974 | 342 | 165 | 1,497,960 | 775,260 | 9,324,168 | 16% | 8% |
| 1975 | 463 | 165 | 2,027,940 | 1,305,240 | 9,854,148 | 21% | 13% |
| 1976 | 584 | 165 | 2,557,920 | 1,835,220 | 10,384,128 | 25% | 18% |
| 1977 | 703 | 165 | 3,079,140 | 2,356,440 | 10,905,348 | 28% | 22% |
| 1978 | 1,096 | 165 | 4,800,480 | 4,077,780 | 12,626,688 | 38% | 32% |
| 1979 | 1,414 | 165 | 6,193,320 | 5,470,620 | 14,019,528 | 44% | 39% |
| 1980 | 1,233 | 165 | 5,400,540 | 4,677,840 | 13,226,748 | 41% | 35% |
| 1981 | 1,590 | 165 | 6,964,200 | 6,241,500 | 14,790,408 | 47% | 42% |
| 1982 | 2,052 | 165 | 8,987,760 | 8,265,060 | 16,813,968 | 53% | 49% |
| 1983 | 2,238 | 165 | 9,802,440 | 9,079,740 | 17,628,648 | 56% | 52% |
| 1984 | 2,306 | 165 | 10,100,280 | 9,377,580 | 17,926,488 | 56% | 52% |
| 1985 | 2,195 | 165 | 9,614,100 | 8,891,400 | 17,440,308 | 55% | 51% |
| 1986 | 1,369 | 165 | 5,996,220 | 5,273,520 | 13,822,428 | 43% | 38% |
| 1987 | 1,533 | 165 | 6,714,540 | 5,991,840 | 14,540,748 | 46% | 41% |
| 1988 | 370 | 165 | 1,620,600 | 897,900 | 9,446,808 | 17% | 10% |
| 1989 | 243 | 165 | 1,064,340 | 341,640 | 8,890,548 | 12% | 4% |
| 1990 | 185 | 165 | 810,300 | 87,600 | 8,636,508 | 9% | 1% |
| 1991 | 195 | 165 | 854,100 | 131,400 | 8,680,308 | 10% | 2% |

\* Under 1987 Court Order
\*\* Cattle and Wild Horses

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The movant has the burden of demonstrating that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant can meet this burden by establishing that there is an absence of evidence on an essential element of the nonmovant's case. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552; *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). All reasonable inferences must be drawn against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987). The non-movant must respond by producing affirmative evidence that a genuine issue of material fact does exist, and such an issue is determined to be genuine if a reasonable jury could resolve a factual matter in the non-movant's favor. *Sweats Fashions, Inc.,* 833 F.2d at 1562. A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a

matter of law. *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir. 1994).

Disposition of plaintiffs' taking claims by summary judgment is appropriate. Although plaintiffs' grazing and range improvement permits confer the right to produce all the water that can be produced in the Allotment, plaintiffs do not have sole control and do not own water that is produced in excess of amounts needed to satisfy the preference authorized for their permitted herd, 25,730 AUMs. Water produced in excess of the preference amount is subject to BLM range management standards, and historically has been available for all wildlife in the Reveille Allotment. Plaintiffs do not show an essential element of its taking claim: ownership of any of the water that has been consumed by wild horses during the period 1972–1991.

Plaintiffs base their claim of ownership of the water consumed by the wild horses on the circumstance that production of water under the grazing and range improvement permits reduces the water to plaintiffs' possession and control. *Osborne v. United States,* 145 F.2d 892 (9th Cir.1944) provides a summary of the history of grazing on federal lands and assists in determining the status of plaintiffs' claim of ownership.

> In the pioneer or 'emigrant' days of western America immense areas of unappropriated and otherwise unused territory were freely used by stockmen for grazing. The government not only refrained from objecting to this practice but in various ways encouraged it and in time this privilege, to use the words of the Supreme Court in *Buford v. Houtz,* 133 U.S. 320, 326 [10 S.Ct. 305, 307, 33 L.Ed. 618 (1890)] ... became ... 'an implied license, growing out of the custom of nearly a hundred years....' This license was held to be the basis of various rights as between the licensee and other private individuals but not as between the licensee and the government.

*Osborne,* 145 F.2d at 894. While these permits create rights as between persons, which must be adequately safeguarded, "the Government for its own use may without payment of compensation withdraw the permit privilege" entirely. *McNeil v. Seaton,* 281 F.2d 931, 934 (D.C.1960). Under Nevada law, claims to water rights are subject to an adjudication procedure to determine the relative rights of users. Nev.Rev.Stat. §§ 533.-090–533.320. Plaintiffs' water rights have not been established in Nevada judicial proceedings. Plaintiffs have not shown an ownership interest in the water consumed by wild horses that is not subject to BLM range management standards.

A necessary prerequisite to a taking claim is that plaintiffs demonstrate ownership or title to the property in issue at the time of the taking. *United States v. Dow,* 357 U.S. 17, 20, 78 S.Ct. 1039, 1043, 2 L.Ed.2d 1109 (1958); *Georgia–Pacific Corp. v. United States,* 215 Ct.Cl. 354, 568 F.2d 1316, 1319, *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). The Supreme Court traditionally has resorted to " 'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth (and Fourteenth) amendments...." *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992); *see also Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). Recognition that the Takings Clause does not require compensation when an owner is barred from putting land to a use that is proscribed by those existing rules or understandings is surely unexceptional.

Plaintiffs point out that their range improvement permits are limited to improvements "necessary to the care and management of the permitted livestock," as distinguished from a "cooperative arrangement" which is subject to mutual agreement. *See* 43 U.S.C. § 315c (1988). From this, plaintiffs argue that all of the water produced under the range improvement permits necessarily must be devoted exclusively to requirements of the permitted herd, and not to achieve other range management objectives. Plaintiffs state:

> Neither the applications nor the permits in this case were for the purpose of 'achiev[ing] management objectives,' re-

gardless of whose objectives they are construed to be. These applications and permits express as their only permitted purpose "the care and management of permitted livestock", just as prescribed by Congress, and the tangible improvement and the intangible water right are clearly private property unaffected by federal control so long as the purpose is being achieved and valid permit conditions are being met.

This argument is without merit. Plaintiffs' range improvement permits were approved in order to accommodate the "deferred rest rotation system" employed by plaintiffs to improve proper forage utilization and conform to BLM grazing policies. Plaintiffs' deferred rest rotation system implements BLM's range maintenance objectives. It is additional to the care and management of permitted livestock.

At various times since 1952, plaintiffs and their predecessors have applied for and obtained BLM range improvement permits for development of water sources on the Reveille Allotment. Developed water sources can consist of springs, pipelines, wells, reservoirs, ditches and catchments or be a combination of several of these. A water source is considered to be developed when a surface or sub-surface water is manipulated to change the location, quantity, quality or period of availability.

Typically, plaintiffs' range improvement permits provide:

2. The permit does not accord to the permittee any preference, privilege, or consideration of any kind except as expressly provided herein.

3. The permit is subject to cancellation in whole or in part if the lands or portions thereof are withdrawn or reserved under a Public Land Order or are classified for disposal under any public land law, where such improvement or part thereof would interfere with the use of the land for the purposes of such withdrawal, reservation, or disposal. (

4. The permittee will comply with the laws of the State within which the improvements are located with respect to water filings....

5. Any public lands or impounded waters will be available for wildlife use and open to the public for hunting and fishing in accordance with State regulations. Such lands and waters shall also be open for other authorized public use to the extent that such use is consistent with the purpose for which the permit is granted.

6. Specifications for the improvements authorized by this permit *must* be approved by the Bureau prior to construction.

Like the grazing permit itself, range improvement permits are typically "subject to cancellation for noncompliance with the rules and regulations now or hereafter approved by the Secretary of the Interior, or where the improvement would interfere with the range management practices determined by the Bureau of Land Management, or for a violation of any of the [permit's] terms...."

As the Supreme Court has held in *United States v. Fuller*, 409 U.S. 488, 494, 93 S.Ct. 801, 805, 35 L.Ed.2d 16 (1973), the Taylor Grazing Act (43 U.S.C. §§ 315 et seq.) expressly states that no compensable expectancy is created in the permit lands themselves as a result of permit issuance. Also, given the longstanding multiple-use mandate incorporated in all of the governing legislation, and in the terms of their permits, plaintiffs did not have a compensable expectancy in exclusion of wild horses and other wild animals from the allotment or exclusive use of the forage and water. Indeed, as the district court and the dissenting Ninth Circuit judge recognized in *Fallini v. Hodel*, 725 F.Supp. 1113, 1116 (D.Nev.1989) and *Fallini v. Hodel*, 963 F.2d 275, 279–80 (9th Cir.1992), the "plain meaning" of "wildlife" in the range improvement permit for the Deep Well included wild horses. Unlike the claim in *Fallini v. Hodel*, plaintiffs' claim here is not limited to the Deep Well, but rather encompasses all water sources, developed and undeveloped, on the Allotment. There are at least 47 undeveloped waters on the Allotment, as well as 57 developed waters under separate Section 4 range improvement permits. Given the undisputed presence of wild free-roaming horses on the allotment at the time these permits were issued, plaintiffs

could not reasonably have expected to have exclusive use of the water or forage.

Plaintiffs ignore that any loss, or claim of a regulatory taking by the United States, must be evaluated in light of: (1) the logically antecedent inquiry—in this case, whether there is a compensable expectancy to exclusive use of the allotment in the first instance, *Lucas,* —— U.S. at ——, 112 S.Ct. at 2901; and, (2) the definition of the property as a whole, the unit of property "whose value is to furnish the denominator of the fraction." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987); *Concrete Pipe Prods., Inc. v. Construction Laborers Pension Trust,* —— U.S. ——, —— – ——, 113 S.Ct. 2264, 2290–91, 124 L.Ed.2d 539 (1993). Plaintiffs are silent in the face of the Supreme Court decisions in *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 130–31, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978), and numerous other regulatory takings cases which uniformly reject the proposition that diminution in property value, standing alone, can establish a taking.

Plaintiffs' grazing permit and their range improvement permits expressly are subject to multiple use management of public lands under the Taylor Grazing Act, Federal Land Policy & Management Act of 1976 (FLPMA), 43 U.S.C. 1702(c), (k), and Public Range Lands Improvement Act of 1978 (PRIA), 43 U.S.C. §§ 1901(b)(2), 1902(d), (f), 1903(b), and compliance with all regulations "now or hereafter approved by the Secretary of the Interior." Clearly under these provisions, plaintiffs' range improvement permits are not limited to the "care and management of permitted livestock" as plaintiffs claim.

Contrary to plaintiffs' assertion, all of their Section 4 range improvement permits are expressly subject to regulations then existing as well as those subsequently approved by the Secretary. All of their Section 4 range improvement permits (43 U.S.C. § 315c) specifically state that "[a]ny public lands or impounded waters will be available to wildlife use and open to the public for hunting and fishing in accordance with State regulations" and "also be open for other authorized public use" not inconsistent with the purpose of the permit. Under the regulations, installation and maintenance of range improvements must be consistent with multiple use management. 43 C.F.R. § 4120.3–1(a) (1992). "Range improvements" are defined as "an authorized activity or program on or relating to rangelands which is designed to improve production of forage; change vegetative composition; control patterns of use; provide water; stabilize soil and water conditions; and provide habitat for livestock, wild horses and burros, and wildlife." 43 C.F.R. § 4100.0–5 (1992). Certainly, wild horses were present within the Reveille Allotment prior to enactment of the Wild Horses Act, and, furthermore, all of plaintiffs' range improvement permits are by their express terms subject to then existing and subsequently approved rules and regulations.

To succeed in establishing a compensable taking, plaintiffs must show a taking of economically viable use. While plaintiffs attempt to "shoehorn [their] claim into this analysis" by asserting that the water which the horses consumed was consumed in its entirety, the Supreme Court has flatly "rejected this analysis years ago in *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 130–31, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978), where [it] held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable." *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2290. Indeed, "[t]o the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of the parcel in question." *Id.*

Plaintiffs cannot define their property as merely the portion that they claim was taken—merely the cost of providing water which was consumed by the horses. In fact, in their complaint, plaintiffs describe their ranch property as a whole as including exclusive rights to harvest forage on public land, public land range improvements, exclusive ownership of rights to appropriate all of the water, and their grazing "preference" on public land. Existing uses of their property

are unaffected; their cattle have not been without forage or water. Plaintiffs do not dispute that since 1971, their total preference has remained at 25,730 AUMs, and actual use of the allotment since 1976 has been at the full preference.

On the basis of the foregoing, and on the statement made at the close of argument, defendant's motion for summary judgment must be allowed. The Clerk is directed to dismiss the complaint. No costs.