56 F.3d 1378
 Susan L. FALLINI, and Joseph B. Fallini, Jr., in each of the
following capacities: as an individual person and successor
to the interest of Helen Fallini as sole heir of Helene
Fallini, deceased, executor of the last will of Helene
Fallini, and Trustee of the Helene Fallini Living Trust and
the Helene Fallini Living Trust as the sole distributee of
the last Will of Helene Fallini, Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 No. 94-5110.
 United States Court of Appeals,
Federal Circuit.
 June 8, 1995.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
Nov. 8, 1995.
 
 William F. Schroeder, Vale, OR, argued for plaintiffs-appellants. With him on the brief was William A. Schroeder, of Boise, ID.
 Peter A. Appel, Attorney, Environment and Natural Resources Div., Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Lois J. Schiffer, Asst. Atty. Gen., John A. Bryson and Dorothy R. Burakreis, Attorneys. Of counsel was Laura B. Brown, Office of the Sol., Dept. of the Interior, Washington, DC.
 James L. Huffman, Dean and Professor of Law Director, Natural Resources Law Institute, Northwestern School of Law, Lewis and Clark College, of Portland, OR, was on the brief for amicus curiae, Water for Life, Inc.
 Before MICHEL, LOURIE and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 In this Fifth Amendment "takings" case, the Fallinis, who are engaged in cattle ranching in Nevada, argue that the federal government has taken personal property from them without compensation. The Fallinis contend that the government effected a "taking" by requiring them to provide water to wild horses living in the area in which the Fallinis conducted their ranching activities. The Court of Federal Claims ruled against the Fallinis, concluding on motion for summary judgment that they had no property right that was taken by governmental action. Fallini v. United States, 31 Fed.Cl. 53 (1994). We conclude that their complaint was not filed within the applicable statute of limitations period and that the complaint should be dismissed on that ground.
 
 
 2
 * The appellants, Susan and Joseph Fallini, own a 2700-acre ranch in south-central Nevada. The Fallinis' ranch property is located within a region known as the Reveille Allotment, which consists of 657,520 acres of federally owned land. Pursuant to federal permits, the Fallinis graze cattle on the public land surrounding their ranch property.
 
 
 3
 The Fallini family has engaged in ranching in the area since the 19th century. Over time, they have developed a number of water sources on the public land to water the cattle that are permitted to graze there. Although the Fallinis do not own the land where the water sources are located, they contend that under federal and state law they enjoy proprietary rights in all the water they produce from the waterworks that they and their predecessors have constructed.
 
 
 4
 In 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. Secs. 1331-1340, which provided for the management and protection of wild horses and burros on public lands. The Act prohibited the removal, destruction, or harassment of wild horses and burros found on public lands, and it authorized the Secretary of the Interior to issue regulations providing for the management of the wild horses and burros.
 
 
 5
 In November 1992, the Fallinis filed a complaint in the Court of Federal Claims, contending that the government had taken their property by requiring them "to provide water to wild horses whenever plaintiffs provided water to their domestic livestock after December 17, 1971 [the effective date of the Wild Free-Roaming Horses and Burros Act], on penalty of loss of their grazing preference." The Fallinis' complaint does not describe exactly what the government required them to do in order to "provide water to the wild horses," but they elsewhere assert that they have been prohibited from fencing their water sources in ways that would permit cattle access to the water but prevent wild horses from having access. In their complaint, the Fallinis alleged that between 1971 and 1991 the cost of providing water to wild horses that took water from the Fallinis' developed water sources totaled approximately $1 million.
 
 
 6
 The Court of Federal Claims granted summary judgment to the government. The court first held that the Fallinis do not own the water they produce in excess of the amounts necessary to satisfy the cattle authorized under their federal grazing permits. The court further concluded that, because the government may regulate the use of the public lands on which the Fallinis' cattle are allowed to graze, the Fallinis "did not have a compensable expectancy in exclusion of wild horses and other wild animals from the allotment or exclusive use of the forage and water." Fallini v. United States, 31 Fed.Cl. at 58.
 
 
 7
 On appeal, the Fallinis contend that the court erred in characterizing their interest in the water that they brought to the surface at the developed water sources on the Reveille Allotment. Based on their claim that they enjoy ownership rights in that water under federal and state law, the Fallinis argue that the government took their property without compensation when it prohibited them from barring the wild horses from drinking water at those sites.
 
 
 8
 The government responds, first, that the Fallinis failed to file their complaint within the applicable statute of limitations period and that the complaint therefore should be dismissed. On the merits, the government argues that the Court of Federal Claims was correct in ruling that the government had the right to condition the Fallinis' use of the public lands on their not barring the wild horses from having access to the developed water sources.
 
 II
 
 9
 We do not reach the merits of the Fallinis' claim, but instead vacate the judgment of the Court of Federal Claims and direct that court to dismiss the complaint as untimely filed.
 
 
 10
 The Fallinis brought their claim against the United States under the Tucker Act, 28 U.S.C. Sec. 1491. Actions brought under the Tucker Act are time-barred unless they are filed within six years of the date that the cause of action accrued. 28 U.S.C. Sec. 2501. As a general matter, a cause of action accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action. Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d 1478, 1481 (Fed.Cir.1994). The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue. Menominee Tribe v. United States, 726 F.2d 718, 721 (Fed.Cir.), cert. denied, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984).
 
 
 11
 In the present case, the objective standard is clearly met, because the appellants have been cognizant of the facts underlying the alleged taking since long before they filed their complaint in the Court of Federal Claims. The complaint alleges that the uncompensated taking began in 1971, when Congress enacted the Wild Free-Roaming Horses and Burros Act, and has continued since that time.
 
 
 12
 On October 3, 1983, the Fallinis sent a bill to the Bureau of Land Management seeking compensation for the water drunk by the wild horses. At least by that date, then, the Fallinis were aware of all the facts necessary to establish the liability of the United States for the alleged taking. Unless the Fallinis were justified in delaying the filing of their complaint following that event, their claim is barred because it was not filed in the Court of Federal Claims until 1992, more than six years after the 1983 bill that the Fallinis submitted to the Bureau of Land Management.
 
 
 13
 The Fallinis advance two theories that, they claim, enable them to avoid dismissal under the time bar. First, they argue that their complaint was filed within the limitations period because they have experienced a continuous taking over many years and the taking did not stabilize until November 28, 1986, a date slightly less than six years before the filing of their suit. Second, they allege that every drink taken by every wild horse from 1971 through the date of the filing of their complaint constituted a separate taking. Under that theory, the Fallinis would not be able to recover for any water taken more than six years before they filed suit, but they would be entitled to claim compensation for the water taken within the six-year period before their complaint was filed. As we analyze the case, neither of the Fallinis' theories suffices to overcome the limitations bar.
 
 
 14
 In support of their first theory, the Fallinis claim that they have been subject to a continuous taking under United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), and its progeny. See generally Applegate v. United States, 25 F.3d 1579, 1581-84 (Fed.Cir.1994). Under that theory, they contend, their cause of action for the continuous taking that began in 1971 did not accrue until 1986.
 
 
 15
 In Dickinson, the Supreme Court announced the principle that, when the government allows a taking of land to occur by a continuing process of physical events, plaintiffs may postpone filing suit until the nature and extent of the taking is clear. 331 U.S. at 749, 67 S.Ct. at 1385. The taking in Dickinson resulted from the government's construction of a dam that intermittently inundated the property of nearby landowners. Noting that the landowners were uncertain at first how frequently the dam would result in flooding (and thus whether an actual permanent taking had occurred), the Court in Dickinson held that the plaintiffs' cause of action in such a case does not accrue until "the situation becomes stabilized." Id.
 
 
 16
 Dickinson contains language that can be read to suggest that a cause of action for a taking does not accrue until all the damages resulting from the taking can be finally calculated. See, e.g., Dickinson, 331 U.S. at 749, 67 S.Ct. at 1385 (landowner may postpone suit until "the consequences [of the governmental act in question] have so manifested themselves that a final account may be struck"). That interpretation of the Dickinson rule, however, would be broader than even the appellants contend for, as it would mean that in a case such as this one, where the damages continue to increase over time, the plaintiffs' cause of action would never accrue and the statute of limitations would never run. See Gustine Land & Cattle Co. v. United States, 174 Ct.Cl. 556, 656, 1966 WL 8856 (Ct.Cl.1966) (broad interpretation "would put the Dickinson doctrine in unending conflict with the statute of limitations").
 
 
 17
 The Supreme Court has not read Dickinson so expansively. In United States v. Dow, 357 U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109 (1958), the Court characterized Dickinson as holding only that the statute of limitations does not bar an action for a taking by flooding "when it was uncertain at what stage in the flooding operation the land had become appropriated to public use."
 
 
 18
 Following Dow, the Court of Claims adopted a similarly narrow interpretation of Dickinson and the meaning of "stabilization" in the takings context. In Kabua v. United States, 546 F.2d 381, 384, 212 Ct.Cl. 160 (1976), the court noted that in Dow, the Supreme Court "more or less limited [Dickinson ] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking." Accord Hilkovsky v. United States, 504 F.2d 1112, 1114, 205 Ct.Cl. 460 (1974) (Dow "distinguished the flooding situation in Dickinson from other types of Government taking because, in the slow flooding situation in Dickinson, the full extent of the Government taking could not be known until the high water mark of the flooding had been reached"). And in Barnes v. United States, 538 F.2d 865, 210 Ct.Cl. 467 (1976), on facts very similar to those in Dickinson, the court held that a taking by flood accrued in 1973 rather than in 1969, the date of the first flood. The court explained that the taking must be dated from the time that "it first became clearly apparent ... that the intermittent flooding was of a permanent nature." Id. at 873. In other post-Dickinson cases, the Court of Claims has made clear that it is not necessary that the damages from the alleged taking be complete and fully calculable before the cause of action accrues. Columbia Basin Orchard v. United States, 88 F.Supp. 738, 739, 116 Ct.Cl. 348 (1950) ("we do not think the Supreme Court, in the Dickinson case, meant to hold that plaintiff was entitled to wait until any possibility of further damage had been removed"); Nadler Foundry & Mach. Co. v. United States, 164 F.Supp. 249, 251, 143 Ct.Cl. 92 (1958) (same); see also Wilcox v. Executors of Plummer, 29 U.S. (4 Pet.) 172, 177, 7 L.Ed. 821 (1830) (statute of limitations begins to run when breach of duty occurs; "right to sue is not suspended, until subsequent events shall show the amount of damage or loss").
 
 
 19
 In the case at bar, the "permanent nature" of the taking was evident to the Fallinis at least by 1983, when they sent their water bill to the Bureau of Land Management. The Fallinis maintain that the taking was continuous from 1971 on, but that it did not "stabilize" until November 28, 1986. The only event to occur on or about that date, however, was the formation of the Herd Management Area (HMA) in settlement of one of the Fallinis' prior suits against the government.
 
 
 20
 The HMA established the historical location and herd population of wild horses in the Reveille Allotment. As part of the settlement, the Bureau of Land Management undertook to conduct an annual census of wild horses in the HMA and to remove any excess horses. Thus, the formation of the HMA served only to reduce the damages the Fallinis were suffering because of the alleged taking; it did nothing to establish that the horses' drinking constituted a taking for which the United States was liable.
 
 
 21
 Three years before the HMA was established, the Fallinis billed the federal government for the water allegedly taken by the wild horses up to that point. At least by that time, the situation had become clearly apparent, and therefore had "stabilized" within the meaning of Dickinson, because the bill that the Fallinis sent to the Bureau of Land Management indicated that they were fully aware of all the facts that, on their view of the case, led to the conclusion that the government's actions amounted to a taking. The only changes in the ensuing years were changes in the number of protected horses in the Reveille Allotment, and thus the amount of water taken. Nothing that happened in those later years had the legal effect of triggering, for the first time, the Fallinis' obligation to sue for the alleged takings that had occurred since the enactment of the Wild Free-Roaming Horses and Burros Act in 1971. Thus, the Fallinis' first theory does not allow them to avoid the statute of limitations bar.
 
 
 22
 Under their second theory, the Fallinis concede application of the time-bar as to pre-1986 events, but seek compensation for injury they suffered after 1986, i.e., within the six years prior to the filing of their suit. That claim, however, depends upon characterizing every drink by every wild horse as a new and independent federal taking compensable under the Fifth Amendment.
 
 
 23
 In analyzing this theory of recovery, it is useful to analogize the conduct at issue in this case to a taking of real property. If a landowner owns a parcel of beachfront property and the government enacts legislation demanding that the landowner allow others to walk along the shore, the government has effected a taking of an easement on the landowner's property. See Nollan v. California Coastal Comm'n, 483 U.S. 825, 831, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987). For purposes of claim accrual, such a taking occurs on the date of enactment of the legislation. Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d at 1482; De Anza Properties X, Ltd. v. Santa Cruz, 936 F.2d 1084 (9th Cir.1991). Every instance of a beachcomber using the public easement does not constitute a separate taking, even though each use may inflict psychic or economic injury on the landowner.
 
 
 24
 The analysis of the present facts is similar. In their complaint, the Fallinis allege that the Wild Free-Roaming Horses and Burros Act deprived the Fallinis of their right to exclude wild horses from the developed water sources on the Reveille Allotment. In light of those allegations, it is the enactment of the statute, not the individual intrusions by the horses, to which a court must look to determine if there has been a taking.
 
 
 25
 The fact that the water at issue in this case is personalty and the land at issue in the easement case was realty does not alter the nature of the analysis. For purposes of determining when the Fallinis' claim accrued, it is necessary in either case to look to the nature and timing of the governmental action that constituted the alleged taking. Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d at 1481.
 
 
 26
 If the horses were agents or instrumentalities of the United States government, the analysis of what governmental action constituted the alleged taking might well be different. See Mountain States Legal Found. v. Hodel, 799 F.2d 1423, 1428 (10th Cir.1986) (en banc), cert. denied, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). But the horses are not agents of the Department of the Interior any more than beachcombers wandering across a property owner's land are agents of the legislature that mandated the creation of an easement along the shore.
 
 
 27
 What the Fallinis may challenge under the Fifth Amendment is what the government has done, not what the horses have done. The only governmental action that could constitute a compensable taking in this case is the government's directive forbidding the Fallinis from shooing the horses away from the water that the Fallinis have produced at their developed water sources. That governmental action cannot be regarded as recurring with every new drink taken by every wild horse, even though the consumption of water by the wild horses imposes a continuing economic burden on the Fallinis. See Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (proper focus, for statute of limitations purposes, "is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts became most painful"). Because the Fallinis identify the enactment of the Wild Free-Roaming Horses and Burros Act as the governmental action that prevented them from fencing the horses away from their water sources, and because they admit that they suffered injury from the date of enactment, their claim must be regarded as accruing long before they filed their present suit.
 
 III
 
 28
 Based on our analysis of the Fallinis' takings claim, we conclude that their claim was time-barred. We therefore vacate the judgment and remand this case to the Court of Federal Claims with instructions to dismiss the complaint as untimely.
 
 
 29
 Each party shall bear its own costs.
 
 VACATED AND REMANDED WITH INSTRUCTIONS