MOORE, Judge.
 

 Jesse Earl Long, Jr., and Bettye Long appeal from a summary judgment entered by the Limestone Circuit Court in favor of the City of Athens (“the City”) on their claims of negligence, trespass, nuisance, and inverse condemnation, based on the City’s alleged flooding of their property.
 

 Facts
 

 In 1957, the Longs purchased approximately 31.5 acres of unimproved property in Athens (“the Long property”) that is located on the north side of Brown’s Ferry Road and is also bound by Lucas Ferry Road on the west and Highway 72 to the north. According to Bettye Long’s deposition testimony, there were no ditches on the property at the time the Longs purchased it and the land was dry. Over the years, subdivisions have been developed on each side of the Long property resulting in increased water flow. According to the Longs, water from each of the surrounding subdivisions is discharged onto the Long property as a result of the drainage systems for which the City is responsible. Jesse Long stated in his answers to the City’s interrogatories that, each time it rains, water is diverted from the surrounding subdivisions onto the Long property.
 

 According to Bettye Long, the Longs first began to get water on their property from a subdivision located to the south of the Long property. Jesse Waddell, the City’s expert witness in the field of civil
 
 *1112
 
 engineering, testified in his deposition that the bulk of the water that flows onto the Long property comes from under Lucas Ferry Road, which is west of the Long property. Waddell also submitted an easement evaluation, in which he stated that Brown’s Ferry Road is acting as a dam along the southern property line of the Long property and that its elevation results in ponding of water on the Long property. Bettye Long testified in her deposition that Jesse Long had constructed two ditches on the Long property to accommodate the two channels of water that flow onto the Long property. According to James Rich, the public-works director for the City, the two channels of water that flow onto the Long property run in a southeasterly direction across the property. The water that enters the first channel, which appeared to Rich to be a natural drainage channel, comes from a culvert running underneath Highway 72, which is located to the north of the Long property. The water that enters the second channel comes from underneath Lucas Ferry Road. According to Rich, the second channel ties into the roadside ditch on Brown’s Ferry Road and then goes to a culvert that runs underneath Brown’s Ferry Road. Rich testified that he had witnessed flooding on the Long property upstream on Lucas Ferry Road and at the Brown’s Ferry Road culvert from rainfall in May 2003.
 

 Bettye testified that all the Long property floods and that water goes across Brown’s Ferry Road onto the Long property. Kenneth Underwood, an expert witness for the Longs, testified by deposition that studies indicated that Brown’s Ferry Road essentially acts as a dam and that, with all the development that has occurred surrounding the Long property, the City had not updated the design of the drainage facilities under Lucas Ferry Road or Brown’s Ferry Road to accommodate the increased development and the accompanying increase in storm-water runoff. Underwood stated that each development around the Long property added more storm water runoff to the system and that that has exacerbated the problem that existed when the Longs purchased the property.
 

 On August 20, 2002, and September 11, 2003, the City requested, and the Longs granted to the City, temporary drainage construction easements to allow the City to make improvements to the existing drainage system on the Long property. James Rich testified that, since he began working for the City in late 2001, the City had taken mowing equipment to the Long property and had cut the vegetation along the banks of the channels on the Long property, around the dates the easements had been granted. Bettye also testified that she believed the City had come out in 2003, without a written agreement, and had cleaned out the ditches that her husband had constructed and that the City had attempted to clean the ditches a fourth time, but their equipment had gotten stuck and they did not finish cleaning them. Bettye also stated that on one occasion when the City was cleaning the ditches, Rich had had the City remove an old tree from one of the ditches her husband had constructed.
 

 Underwood testified that when he visited the Long property and the surrounding areas, he did not notice any serious debris blockage inhibiting the water flow in the culverts. Underwood stated that he had seen vegetation in the ditches along Lucas Ferry Road and on the Long property, but nothing that would stop the flow of the water. Bettye also testified that she had seen trash in the culvert under Lucas Ferry Road but that it had not stopped the water from flowing onto the Long property.
 

 
 *1113
 
 The Longs presented several engineering studies on the drainage systems that identified the Long property as a problem area for flooding. Those studies made various recommendations to alleviate those problems, including requiring holding ponds for additional developments surrounding the Long property and enlarging the storm culverts underneath Brown’s Ferry Road and Lucas Ferry Road. Those recommendations were not followed by the City.
 

 Procedural History
 

 The Longs filed a complaint against the City and certain fictitiously named defendants on July 14, 2006. The Longs asserted claims of negligence, trespass, nuisance, and inverse condemnation. On August 21, 2006, the City filed a motion to dismiss the Longs’ complaint; that motion was declared moot by a notation on the case-action-summary sheet on November 8, 2006.
 

 The City filed an answer to the complaint on November 6, 2006, in which it also asserted a number of affirmative defenses. On January 30, 2008, the Longs filed a motion for a summary judgment. The City filed an opposition to the Longs’ summary-judgment motion on February 11, 2008. On February 15, 2008, the City filed a motion for a summary judgment in which it argued that all the Longs’ claims were barred by the statute of limitations, among other arguments. The trial court entered an order denying the Longs’ summary-judgment motion on February 19, 2008.
 

 Also on February 19, 2008, the trial court entered an order directing the parties to mediation; that mediation was unsuccessful, however. The Longs filed a response to the City’s summary-judgment motion on April 16, 2008. After a hearing, the trial court entered an order on April 29, 2008, granting the City’s motion for a summary judgment. The Longs filed a postjudgment motion on May 6, 2008; that motion was denied on May 7, 2008. The Longs filed a notice of appeal to the Alabama Supreme Court on May 23, 2008; that court transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7.
 

 Standard of Review
 

 In
 
 General Motors Corp. v. Kilgore,
 
 853 So.2d 171, 173 (Ala.2002), the Alabama Supreme Court outlined the appropriate standard of review of a summary judgment:
 

 “ ‘We review this case
 
 de novo,
 
 applying the oft-stated principles governing appellate review of a trial court’s grant or denial of a summary judgment motion:
 

 “ ‘ “We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. ‘Substantial evidence’ is ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.” ’
 

 “American Liberty Ins. Co. v. AmSouth Bank,
 
 825 So.2d 786, 790 (Ala.2002)
 
 *1114
 
 (quoting
 
 Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C.,
 
 792 So.2d 369, 372 (Ala.2000) (citations omitted)).”
 

 Discussion
 

 The Longs present three issues on appeal: (1) whether the trial court’s denial of their summary-judgment motion was proper; (2) whether the trial court erred in granting the City’s summary-judgment motion; and (3) whether the statute of limitations applicable to the Longs’ claim for damages for inverse condemnation is the same as the statute of limitations applicable to a negligent-maintenance claim. Because a determination of whether the trial court properly entered a summary judgment in favor of the City will necessarily address the remaining issues, we will first examine the merits of the City’s summary-judgment motion. The trial court did not give specific reasons for entering the summary judgment in favor of the City; therefore, “we will affirm the judgment if there is any ground upon which the judgment could have been based.”
 
 McCloud v. City of Irondale,
 
 622 So.2d 1272, 1273 (Ala.1993).
 

 In its summary-judgment motion, the City first argued that each of the Longs’ claims were barred by the applicable statute of limitations. The complaint alleged claims of negligent design and negligent maintenance of the drainage systems in Athens. On appeal, the Longs do not present an argument regarding their negligent-design claim. In distinguishing between the accrual of the causes of action for claims of negligent design and those of negligent maintenance of a drainage system, the Alabama Supreme Court stated in
 
 Reichert v. City of Mobile,
 
 776 So.2d 761 (Ala.2000):
 

 “ ‘For an abatable nuisance the cause of action does not arise until the harmful consequences occur, and each occurrence or recurrence of such damages constitutes a separate cause of action. But for an injury by a permanent and unabatable condition the damages are estimated on the hypothesis of an indefinite continuance of the nuisance, and thus affecting the permanent value of the property. In such event, one may not recover in successive suits, but his damages are awarded in solido in one action.’ ”
 

 776 So.2d at 764-65 (quoting
 
 Harris v. Town of Tarrant City,
 
 221 Ala. 558, 560, 130 So. 83, 84 (1930)). In
 
 Harris,
 
 the supreme court explained that a city’s negligent design of a drainage system would be treated as an unabatable condition, while negligent-maintenance claims would call for the rule applicable to abatable conditions, as stated in
 
 Reichert,
 
 to apply.
 
 See Harris,
 
 221 Ala. at 560, 130 So. at 85.
 

 With regard to their negligent-maintenance claim, the Longs argue that the problems have worsened over the years and that, as the flooding continues, “the cause of action is extended out from each flood event and does not stop and start on any particular flood event.” According to
 
 Reichert,
 
 for negligent-maintenance claims, “each flood event is an abatable nuisance and gives rise to a separate cause of action.” 776 So.2d at 765. Jesse Long stated in his answers to the City’s interrogatories that, each time it rains, water is diverted from the surrounding subdivisions onto the Long property. The Longs also alleged in their complaint that the Long property had flooded “on substantial numerous recurring occasions through and including the date of the filing” of their complaint. Additionally, Trey Walden, the Longs’ son-in-law, testified in his deposition that he had seen the entirety of the Long property flooded in 2003 or 2004 and that he had “watched the water build up and become worse and worse over
 
 *1115
 
 the years.” Viewing the evidence in a light most favorable to the Longs, we conclude that the flooding of the Long property was continuous and that there were flood events within two years of the filing of their complaint. We now must determine whether the Longs presented substantial evidence of negligent maintenance sufficient to avoid a summary judgment on those claims.
 
 See Reichert,
 
 776 So.2d at 765.
 

 The Longs argue that the City had a duty to maintain the drainage pathways on the Long property, citing
 
 Kennedy v. City of Montgomery,
 
 423 So.2d 187, 188-89 (Ala.1982), in addition to its maintenance of the drainage systems of the streets and developments surrounding the Long property.
 
 See Kennedy,
 
 and Ala.Code 1975, § 11-50-50. In order to avoid a summary judgment on their negligent-maintenance claim, the Longs
 

 “must present evidence from which a jury could reasonably conclude that the flooding of their property was proximately caused by the City’s failure to provide appropriate upkeep for the storm-drainage system in its existing condition, rather than by the City’s failure to correct any alleged design or construction problems with ... that system.”
 

 Reichert,
 
 776 So.2d at 765-66 (citations omitted).
 

 In
 
 Locke v. City of Mobile,
 
 851 So.2d 446 (Ala.2002), Locke alleged that the City of Mobile had negligently maintained the drainage system in her neighborhood and that its negligent maintenance of the system had resulted in the flooding of her property. 851 So.2d at 447. Locke testified that she was uncertain whether the drains were actually clogged or if the problem was caused by heavy rainfall.
 
 Id.
 
 at 447. Locke presented the testimony of an expert witness, who, by the process of elimination, determined that the flooding of Locke’s property resulted from a blockage in the drainage system.
 
 Id.
 
 at 449. The Alabama Supreme Court determined that a blockage “does not necessarily mean negligent maintenance” because a blockage could occur “as well from the sudden and unforeseeable deposit of some foreign object or material as from the gradual accumulation of foreseeable debris that prudent maintenance would prevent.”
 
 Id.
 
 at 450. The court concluded that the expert’s testimony did not amount to substantial evidence indicating that the flooding of Locke’s property was due to the failure of the City of Mobile to regularly inspect the drains, per the expert’s recommendations, and, therefore, that the trial court had properly entered a summary judgment in favor of the City of Mobile on Locke’s negligent-maintenance claim.
 
 Id.
 
 at 451, 453.
 

 The Longs do not argue, and have presented no evidence tending to show, that the City negligently allowed debris to enter the drainage system, thereby blocking the flow of water through the same. Rather, in attempting to distinguish the present case from
 
 Locke,
 
 the Longs argue that, unlike in
 
 Locke,
 
 there had been drainage studies submitted to the City that detailed the increased flow of water traveling across the Long property, that the City had failed to follow the recommendations of those studies, and that the City had thereby failed to maintain the drainage systems such that they controlled the flow of water through the Long property. The Longs’ theory of recovery for their claim of negligent maintenance is that, by failing to update the drainage systems to accommodate the increased discharge of surface water from the developments surrounding the Long property, the City failed to maintain those systems.
 

 
 *1116
 
 In
 
 Byrd v. City of Citronelle,
 
 937 So.2d 515 (Ala.2006), a drainage ditch ran across a portion of Byrd’s property that received water from surrounding areas. 937 So.2d at 517. The drainage ditch began to “back up” and flood Byrd’s property in excessive rain events; when the flood water receded, it carried some topsoil from Byrd’s property and her property began to erode.
 
 Id.
 
 at 517. In support of her negligent-maintenance claim against the City of Citronelle, Byrd offered the affidavit testimony of an expert witness, who opined that obstructions in the ditch, obstruction of the driveway pipes, and improper sloping of the ditch evidenced a breach of the City of Citronelle’s duty to adequately maintain the ditch.
 
 Id.
 
 at 521. In determining that none of those conditions identified by Byrd’s expert witness indicated negligent maintenance, the Alabama Supreme Court stated that “[t]he latter two conditions are clearly matters of design or construction” and, citing
 
 Locke,
 
 that an obstruction in the ditch is not necessarily the result of the negligent maintenance thereof.
 
 Id.
 
 at 522.
 

 In the present case, the recommendations of the various studies conducted on the City’s drainage systems included enlarging the culverts under Brown’s Ferry Road and requiring detention and retention ponds for developments upstream of the Long property. Those recommendations speak to matters of design, as did the conditions cited in
 
 Byrd,
 
 i.e., obstruction of driveway pipes and improper sloping of the ditch. Because the Longs have failed to present substantial evidence indicating that the City did not adequately maintain the drainage systems, we conclude that the trial court did not err in entering the summary judgment in favor of the City on the Longs’ negligent-maintenance claim. Because we conclude that the Longs did not present substantial evidence to avoid a summary judgment on their negligent-maintenance claim, we decline to address the issue whether the City had undertaken the duty to maintain the ditches built by Jesse Long on the Long property. Additionally, because the trial court properly entered the summary judgment on the Longs’ negligent-maintenance claim, the trial court’s disposal of the- Longs’ nuisance and trespass claims was also proper.
 
 See Royal Auto., Inc. v. City of Vestavia Hills,
 
 995 So.2d 154 (Ala.2008) (“because the businesses’ negligent-maintenance claims fail, their nuisance and trespass claims must also fail”).
 

 With regard to the Longs’ inverse-condemnation claim, the Longs, citing both caselaw and the inverse-condemnation statute, Ala.Code 1975, § 18-1A-32, argue that their cause of action alleging inverse condemnation accrues from the date of each injury or damage. The City argued in its summary-judgment motion, and again on appeal, that the Longs’ inverse-condemnation claim is barred by the statute of limitations. In
 
 McClendon v. City of Boaz,
 
 395 So.2d 21, 24 (Ala.1981), the
 
 Alabama
 
 Supreme Court stated:
 

 “Inverse condemnation is the taking of private property for public use without formal condemnation proceedings and without just compensation being paid by a governmental agency or entity which has the right or power of condemnation.
 
 Ex parte W.E. Carter,
 
 395 So.2d 65 (1980). Such an action must be brought within the applicable statutory period. When the governmental entity in question is a municipality, an inverse condemnation claim must ‘be presented to the clerk for payment within two years from the accrual of said claim or be barred,’ § 11-47-23, Code of Alabama 1975.”
 

 The court further stated that “the cause of action accrues when the taking is com-
 
 *1117
 
 píete.”
 
 McClendon,
 
 395 So.2d at 24. In
 
 McClendon,
 
 the plaintiffs asserted a claim of inverse condemnation against the City of Boaz for digging a drainage ditch across the plaintiffs’ property.
 
 Id.
 
 at 23. At the time of the filing of the complaint in
 
 McClendon,
 
 the drainage project had not yet been completed and the court determined that the plaintiffs’ claims were not barred by the statute of limitations.
 
 Id.
 
 at 25. In deciding that the cause of action accrues when the taking is complete, the Alabama Supreme Court cited with approval a portion of the United States Supreme Court’s reasoning in
 
 United States v. Dickinson,
 
 331 U.S. 745, 747-49, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947):
 

 “The Government could, of course, have taken appropriate proceedings to condemn as early as it chose both land and flowage easements. By such proceedings it could have fixed the time when the property was ‘taken.’ The Government chose not to do so. It left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy. ...
 

 “Property is taken in the constitutional sense when inroads are made upon an owner’s use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding ‘causes of action’ — when they are born, whether they proliferate, and when they die. We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens. Assuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him. If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him — for instance, the uncertainty of the damage and the risk of
 
 res judicata
 
 against recovering later for damage as yet uncertain. The source of the entire claim — the overflow due to rises in the level of the river — is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.”
 

 See McClendon,
 
 395 So.2d at 25.
 

 The Longs argue that because the discharge of water onto their property has increased and, they say, according to the testimony of Rich and Waddell, it will continue to increase as continued development occurs, the taking has not been completed, but is ongoing, and therefore the statute of limitations has not commenced for the filing of the inverse-condemnation claim. We disagree. A similar argument was asserted in
 
 Fallini v. United States,
 
 56 F.3d 1378 (Fed.Cir.1995). In
 
 Fallini,
 
 the United States Court of Appeals observed that interpreting
 
 Dickinson
 
 as holding that a cause of action for a taking does not accrue until all the damages resulting from the taking can be finally calculated would mean that, in a case in which the damages continue to increase over time, the cause of action would never accrue and the statute of limitations would never run. 56 F.3d at 1381. The court then discussed a number
 
 *1118
 
 of cases that interpreted the United States Supreme Court’s holding in
 
 Dickinson:
 

 “In
 
 United States v. Dow,
 
 357 U.S. 17, 27, 78 S.Ct. 1039, 1047, 2 L.Ed.2d 1109 (1958), the Court characterized
 
 Dickinson
 
 as holding only that the statute of limitations does not bar an action for a taking by flooding ‘when it was uncertain at what stage in the flooding operation the land had become appropriated to public use.’
 

 “Following
 
 Dow,
 
 the Court of Claims adopted a similarly narrow interpretation of
 
 Dickinson
 
 and the meaning of ‘stabilization’ in the takings context. In
 
 Kabua v. United States,
 
 546 F.2d 381, 384, 212 Ct.Cl. 160 (1976), the court noted that in
 
 Dow,
 
 the Supreme Court ‘more or less limited
 
 [Dickinson
 
 ] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking.’
 
 Accord Hilkovsky v. United States,
 
 504 F.2d 1112, 1114, 205 Ct.Cl. 460 (1974)
 
 (Dow
 
 ‘distinguished the flooding situation in
 
 Dickinson
 
 from other types of Government taking because, in the slow flooding situation in
 
 Dickinson,
 
 the full extent of the Government taking could not be known until the high water mark of the flooding had been reached’). And in
 
 Barnes v. United States,
 
 538 F.2d 865, 210 Ct.Cl. 467 (1976), on facts very similar to those in
 
 Dickinson,
 
 the court held that a taking by flood accrued in 1973 rather than in 1969, the date of the first flood. The court explained that •the taking must be dated from the time that ‘it first became clearly apparent ... that the intermittent flooding was of a permanent nature.’
 
 Id.
 
 at 873. In other
 
 post-Dickinson
 
 cases, the Court of Claims has made clear that it is not necessary that the damages from the alleged taking be complete and fully calculable before the cause of action accrues.
 
 Columbia Basin Orchard v. United States,
 
 88 F.Supp. 738, 739, 116 Ct.Cl. 348 (1950) (‘we do not think the Supreme Court, in the
 
 Dickinson
 
 case, meant to hold that plaintiff was entitled to wait until any possibility of further damage had been removed’);
 
 Nadler Foundry & Mach. Co. v. United States,
 
 164 F.Supp. 249, 251, 143 Ct.Cl. 92 (1958) (same);
 
 see also Wilcox v. Executors of Plummer,
 
 29 U.S. (4 Pet.) 172, 177, 7 L.Ed. 821 (1830) (statute of limitations begins to run when breach of duty occurs; ‘right to sue is not suspended, until subsequent events shall show the amount of damage or loss’).”
 

 Fallini,
 
 56 F.3d at 1381-82.
 

 We conclude, therefore, based on the reasoning in
 
 Dickinson, Fallini
 
 and the cases discussed therein, and
 
 McClendon,
 
 that the Longs’ cause of action accrued at the time the taking was complete, or when the first flooding of their property occurred after the completion of the surrounding developments. The City presented evidence indicating that each of the developments designated in the Longs’ complaint as contributors to the flooding were completed by 2001. Thus, any cause of action alleging inverse condemnation would have accrued at the time of the first flood event affecting the Long property after the completion of the developments in 2001.
 

 James Rich testified that he had witnessed flooding on the Long property in May 2003. According to Rich, there was flooding upstream of the Long property on Lucas Ferry Road and there was flooding at the Brown’s Ferry Road culvert as well. Trey Walden also testified that he had seen the Long property flood in either 2003 or 2004 and that that was the worst flooding he had seen on the Long proper
 
 *1119
 
 ty. Although Walden was unsure of the date of that flood, he stated that it could have been 2003; Walden also stated that Bettye said that he was referring to the same flood event that Rich had testified to. Because the City presented evidence of flooding in 2003, after the final surrounding developments were completed in 2001, the City met its burden of establishing that the statute of limitations for the Longs’ inverse-condemnation claim began to run in 2003. The Longs have not presented any evidence indicating that the flooding in 2003 described by Rich and Walden was not the first or most significant flooding event following the completion of the developments causing the flooding of their property by which to measure the completion of the taking of their property. Moreover, the Longs did not present any evidence indicating that any new developments were planned in the areas surrounding their property in the foreseeable future that would potentially increase the flow of water onto, or the damage to, their property. Because the Longs did not file their complaint alleging a claim of inverse condemnation against the City until 2006, we conclude that that claim was barred by the applicable two-year statute of limitations.
 

 The summary judgment entered by the trial court in favor of the City is due to be affirmed.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, J., concur.
 

 BRYAN and THOMAS, JJ., dissent, without writings.