Rel: March 28, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

## SC-2024-0524

_____

## Ex parte City of Muscle Shoals

## PETITION FOR WRIT OF MANDAMUS

## (In re: Reginna Burrell et al.

## v.

## City of Muscle Shoals)

## (Colbert Circuit Court: CV-20-900062)

BRYAN, Justice.

The City of Muscle Shoals ("the City") seeks a writ of mandamus

directing the Colbert Circuit Court ("the trial court") to enter a summary

judgment in its favor on claims asserted against it by several residents of the City. The plaintiffs seek damages on claims of negligence and trespass arising from the City's management of a stormwater-drainage pond in their neighborhood. We grant the petition and issue the writ.

<u>Background</u>

The plaintiffs in this case include Jennifer Cross and Jason Cross; Dana Fisher; Brady Gregory and Amber Gregory; Brett King and Amanda King; Tammy Michael and Charles Michael; Dustin Parker; Carolyn Pate; Jamie Reed; Mary Rowe and Jimmie Rowe; and Miller Terry and Sonya Terry.[1] We will refer to those individuals collectively as "the plaintiffs." All the plaintiffs live in a neighborhood in which the City owns and manages a pond as part of its stormwater-drainage system. Heavy rainfall occurred in February 2019, which overwhelmed the pond and flooded the plaintiffs' houses.

---

[1]Not all the original plaintiffs below joined the answer and brief filed in response to the City's mandamus petition. The appendices to the City's petition do not show why those parties have not participated in this mandamus proceeding. The plaintiffs listed here are those who have joined the answer and brief filed in response to the City's petition. All of them were named in the original complaint.

Procedural History

The plaintiffs filed their complaint against the City on March 6, 2020. They sought damages based on claims of negligence, wantonness, and trespass. The City answered the complaint and asserted that the plaintiffs' claims were barred by § 11-47-190, Ala. Code 1975.

The plaintiffs amended their complaint in November 2021. In that filing, the plaintiffs abandoned their wantonness claim and added a request for injunctive relief. Specifically, they asked the trial court to order the City to enact a stormwater-management plan and to comply with the City's drainage manual for the benefit of other City residents and to prevent future flooding to their properties. The City moved to dismiss the plaintiffs' claim for injunctive relief on the ground that it was barred by substantive immunity. The trial court denied the City's motion.

The City petitioned this Court for a writ of mandamus in April 2022. In March 2023, this Court granted the petition on the ground that substantive immunity barred the plaintiffs from obtaining a judgment directing the City to enact and enforce particular policies. See Ex parte City of Muscle Shoals, 384 So. 3d 37 (Ala. 2023). This Court thus issued

a writ directing the trial court to dismiss the plaintiffs' demand for injunctive relief. Id. at 45. The trial court did so in April 2023.

Thereafter, the City answered the amended complaint, once again asserting that the plaintiffs' claims were barred by § 11-47-190. The City also added a defense that the plaintiffs' claims were barred by substantive immunity. In July 2024, the City moved for a summary judgment on the plaintiffs' claims for damages. The City argued that the claims were barred by § 11-47-190 and that there was not substantial evidence to support the trespass claim. The plaintiffs responded, and, in its reply brief, the City added an argument that substantive immunity barred the plaintiffs from recovering on the ground that the City had failed to comply with its drainage manual.

The trial court denied the City's motion on August 13, 2024. It did not state its reasons for the ruling. The City then filed its mandamus petition with this Court. We ordered an answer and briefs.

<u>Summary-Judgment Evidence</u>

The evidence presented to the trial court showed the following. The City is in a region with complicated hydrology and topography, which makes it susceptible to flooding. In 2019, the plaintiffs all owned houses

in a neighborhood in the City known as Nathan Estates. A drainage pond in the neighborhood exists at a natural low point. The pond receives water from an area of approximately 0.6 square miles, or more than 300 acres.

In 2019, the Nathan Estates pond had no pump. There is no natural tributary or other body of water within the City limits to which water from the Nathan Estates pond can be diverted. Most ponds in the City's stormwater-drainage system that have pumps divert water into the Tennessee Valley Authority reservation or into creeks that drain into the Tennessee River. The Nathan Estates pond has no access to either of those bodies of water.

There is conflicting evidence about whether the Nathan Estates pond was designed as a detention pond or as a retention pond. The City engineer explained that a detention pond is designed to hold water temporarily and to slowly release it into pipes or streams, allowing it to drain in a controlled manner to prevent flooding downstream. Detention ponds typically empty within 24 to 48 hours. A retention pond, however, provides storage for stormwater without a positive outlet. A positive outlet exists when water has access to a pipe or stream without having

to travel uphill. The only outlet for water in a retention pond is evaporation into the air or infiltration into the surrounding soil. Retention ponds typically have permanent or semi-permanent pools.

The City engineer stated that, because no stream or pipes tie into the Nathan Estates pond, it is a retention pond and not a detention pond. The mayor and the civil engineer who consulted with the City agreed that the Nathan Estates pond is a retention pond because it has no outlet through which water can flow out of the pond.

However, the plaintiffs' expert witness stated that the Nathan Estates pond is a detention pond because it was meant to dry up and was not designed to hold water permanently for fishing or similar purposes. He did not distinguish detention ponds from retention ponds on the basis of whether an outlet existed, but solely on whether the pond was intended to permanently hold water. In his opinion, all ponds in a drainage system should have an outlet structure.

Before 2005, the Nathan Estates pond had been privately owned and maintained by the neighborhood's developer. The developer first asked the City to assume ownership and maintenance of the pond in 2001. In 2003 or 2004, the pond flooded into surrounding roads. Because

water dissipated very slowly from the pond, that flooding prevented residents from using the roads for days. The City engineer testified that, in 2005, the City thus purchased and designed improvements to the pond to prevent such road blockages from happening regularly in 10- or 25-year rainfall events.

The industry standard for drainage design and stormwater mitigation is to use 24-hour rainfall probabilities. In hydrology, the phrasing of a "100-year rainfall event" means that, statistically, there is a 1% probability of having a 24-hour rainfall event of that magnitude in any year. It does not mean that rainfall of that magnitude happens only once every 100 years. The Federal Emergency Management Agency ("FEMA") sets the industry standard for flood-risk definitions. Working with civil engineers and using historical data, FEMA creates maps to determine whether and at what probability a particular area is likely to experience flooding. FEMA uses the 1%, or 100-year rainfall event, probability to determine whether a particular house is required to have flood insurance. For areas outside that level of risk, flood insurance may be recommended because of repeat flooding, but it is not required. In

2019, the plaintiffs' houses were not in a FEMA-designated area requiring them to buy flood insurance.

The City uses information from FEMA's mapping as part of its design and planning for stormwater management. The plaintiffs' expert testified that municipal requirements for residential flood control vary greatly by region. Typically, most municipalities require control of 2- to 25-year events, which are statistically more likely to occur. He testified that, at all times relevant to this case, the City required mitigation measures capable of dealing with 25-year rainfall events for residential neighborhoods. Most ponds within the City's drainage system are designed to contain 25- to 50-year rainfall events and would not contain 100-year rainfall events.

The improvements the City designed for the Nathan Estates pond in 2005 were intended to prevent future flooding of the roads in a 25-year rainfall event. The improvements were not designed specifically to protect the plaintiffs' houses from larger, 100-year rainfall events. The City did not perform studies or attempt to determine whether the 2005 improvements would be enough to protect the houses in the neighborhood.

In early 2005, the City had a geotechnical report prepared in anticipation of the City's takeover of the Nathan Estates pond. That report found that the area around the pond has clay soils, which do not drain quickly. Thus, the area had poor potential for natural percolation in the soils beneath the pond. It acted more like a retention pond than a detention pond. Moreover, the underlying groundwater elevation was near the bottom of the pond. Thus, increasing the depth of the pond would have only a limited benefit.

The mayor testified that the City spent approximately $500,000 to expand the pond to double its capacity and to add a spillway on the western side. The City engineer testified that the 2005 improvements that the City designed and implemented were intended to increase the storage capacity of the pond as much as possible within the acreage available. The spillway added did not allow water to leave the 300-acre area that drained into the pond. It did allow water to spill from the pond into a broader area. The intent was to give stormwater as much area as possible laterally to keep it from getting deeper.

The improvements were completed in January or February of 2006. The civil engineer who consulted with the City believed that the pond

9

worked as designed. The improvements were sufficient to handle many rainfall events between 2005 and 2019 and prevented flooding from rendering the surrounding roads impassable.

The plaintiffs' expert witness agreed that the improvements had been constructed in accordance with the City's plans. However, he believed that the spillway was ineffective because water would ultimately return to the pond. After the improvements were made, unless the City brought a portable pump to the pond, water still could leave only by evaporation or infiltration. Thus, there was still no outlet for water to flow out of the pond's broader drainage area. The plaintiffs' expert witness did not have an opinion about how that could be accomplished at the Nathan Estates pond, but he stated that the City "could do something and there was no plan."

The City performed regular maintenance on the pond after its improvements were completed. This included treating the water, providing mosquito control, mowing the surrounding grass and brush, and other services. The City did not make further improvements to the pond between 2006 and 2019. The City had no plan in place before the 2019 flood for how to divert water away from the Nathan Estates pond

10

other than through infiltration, evaporation, or the spillway. The plaintiffs' expert witness did not offer an opinion on whether the City had appropriately monitored the Nathan Estates pond. He did not know what the City's maintenance plan for the pond was or whether the pond was appropriately maintained.

The parties dispute whether the City had notice of any defective condition of the pond after it completed its improvements. The plaintiffs presented the following evidence to show notice and the existence of a defect. Between 2006 and 2019, the pond never emptied. August 2006 and September 2006 City council records show discussions about the volume of water in the Nathan Estates pond. The City clerk recalled that the City council discussed residents' concerns that the pond seldom dried up. He remembered that the idea of adding a pump had been considered but was determined not to be a viable solution because there was no feasible option for where to divert the water. The pond is approximately 2,000 feet and over a hill from the nearest low area, known as Gum Bottom. Moreover, Nathan Estates did not have access to industrial-level power sources necessary to run pumps needed to divert water to Gum Bottom.

Plaintiff Amanda King recalled that the pond overflowed into the roads in 2005 or 2006, after the City had completed its improvements. She could not get to work because of the flooding and had contacted the mayor. She later admitted that she did not remember whether the flooding happened before or after the City's improvements. Her interrogatory responses state that she believed that the flooding occurred in 2005. Between 2005 and 2019, she recalled the pond overflowing into woods nearby, but not over the roads. She never discussed the Nathan Estates pond with any City official or employee between 2005 and 2019. Her husband, plaintiff Brett King, testified that the flooding to their yard happened in early 2005. He never saw the pond overflow any other time between 2005 and 2019.

Plaintiff Tammy Michael testified that there was flooding to her basement while it was under construction in late 2004 or early 2005. She believed that the flooding was associated with rainfall from Hurricane Katrina. However, Hurricane Katrina occurred in August 2005. She recalled that water in the pond exceeded its banks multiple times between 2005 and 2019. Water would get into the road, but the road was

still passable by car. Before 2019, she had no conversations with any City official or employee about the Nathan Estates pond.

Plaintiff Jamie Reed testified that he saw water from the pond overflow into the streets two or three times between 2008 and 2019. He did not complain to the City about the pond before 2019.

Plaintiff Charles Michael testified about problems with a drainage ditch, which would cause water to back up into his yard. He would contact the City, and officials would send someone to unclog the drain and resolve the problem. He never had conversations with anyone with the City about the Nathan Estates pond before 2019.

The plaintiffs' primary complaint seems to be that the City had no plan in place to pump water out of the Nathan Estates pond to prevent flooding to their houses in large rainfall events. Indeed, the City engineer was unaware of any plan by the City to begin pumping water out of the pond if it ever reached a certain level. The mayor agreed that, before the flooding began in 2019, the City did not have a plan in place to pump water from the Nathan Estates pond onto other landowners' property.

The City received heavy rainfall during four days in late February 2019, particularly on Friday, February 22, and Saturday, February 23.

13

Areas within the City received between 12 and 16 inches of rain. The parties presented conflicting evidence about the statistical probabilities of the event. The City engineer did not know if rainfall during any 1 day exceeded a 100-year rainfall event. He estimated that the combined 4 days were between a 100- to 300-year rainfall event. The civil engineer who consulted with the City stated that the event exceeded the 1%, or 100-year rainfall event, probability. He stated that the event lasted longer than the 24-hour standard used for design and that design probabilities are not used to measure actual events.

Using the 24-hour-design probability standard, the plaintiffs point to the City's drainage manual, which incorporates certain statistical probabilities for planning purposes for new construction. According to those probabilities, the plaintiffs say, the February 2019 rainfall over specific 24-hour periods did not exceed a 25-year rainfall event. The State climatologist who testified for the plaintiffs estimated that the event was a 30-year to a 40-year rainfall event. Nonetheless, he determined that it was the fourth largest on record for a four-day rainfall event for the area and the third largest on record for a five-day rainfall event.

Regardless of the statistical probabilities, it is undisputed that the event created an emergency for the region. The area had experienced significant rainfall during the preceding weeks. Those rains saturated soils in the area, pushed groundwater tables up, and decreased the ability of further rainfall to infiltrate soils. Moreover, the City ultimately received more rain in late February than the county emergency-management agency had predicted. The storms thus resulted in flooding to multiple parts of the City's drainage system. Roads were closed in places all over the City. State emergency-management officials sent recovery teams to the area and worked with officials in surrounding counties to manage government responses. The governor and other agencies issued emergency declarations for several counties. The City worked with the Red Cross to set up facilities nearby to help local residents.

The day before the rains began, City officials examined the Nathan Estates pond to confirm that it had more storage capacity. It did. However, on Thursday morning, the pond overflowed into nearby roads, which were carrying school traffic. City officials then ordered pumps and began looking for places to divert water from the pond. City officials were

unable to get immediate permission from an adjacent landowner to the south to pump water onto his land. They were able to obtain permission from a landowner over a hill, further away and to the east toward Gum Bottom. To divert the water to Gum Bottom, the City had to order and lay more than 1,800 feet of pipe over a road and across at least 2 residents' properties. The pipe was necessary to carry the water over a hill to a point where gravity would carry it to the lower elevation where the City had permission to direct the water.

As rains continued the next day, two extra pumps were set up at the Nathan Estates pond. With those pumps, City officials were able to keep the water level under control until the early morning hours of Saturday, February 23, 2019. At that time, the rains became so heavy that the area experienced additional flash flooding. The pumps had to be stopped and moved back to keep them from being submerged. Shortly afterward, the mayor called in fire and police departments to begin evacuation of nearby houses. The area received even more rain over the next two days. With pumping, the City was able to reduce the water level approximately six inches per day; thus, it took several days to remove water from the nearby roads.

16

After the 2019 flood, the City worked with a civil-engineering firm engaged in mapping flood zones for FEMA to analyze the event and to make recommendations for how to prevent future flooding. The resulting report noted that the "February 2019 event, and its similar follow-up in 2020, is not a typical storm that would be considered when drafting protection levels from flood risk." It also stated that the "event does highlight a need for more thoughtful protection measures across karst regions. Also, regardless of the intended protection and any future planning, a need exists to keep those already living in this community safe from future flood risk." The report concluded that tripling the pump capacity of the Nathan Estates pond would alleviate flooding problems to residents during 100-year and 150-year rainfall events. The report also suggested that a "proactive drawdown" of water in the pond would help reduce the severity of the impact of larger events.

The City hired the firm to perform a feasibility study as a supplement to that report. The study examined multiple locations to determine where water from the Nathan Estates pond could be diverted. The study was stopped after a few months, however, when each option examined was determined to be cost-prohibitive or to involve annexation

17

problems. The study was to be resumed if the City was able to obtain federal grants to fund a project to divert water to another location.

The City ultimately obtained an easement from the landowner near Gum Bottom to pump water from the Nathan Estates pond in emergencies. The City installed a permanent force main and purchased a portable pump to give it the ability to hold water at a lower elevation. The City engineer did not know if the pump had been permanently installed. There is no indication in the record regarding whether the City tripled the pump capacity, as suggested by its consultant's report. There is also no indication in the record regarding whether Nathan Estates obtained industrial-level power necessary to run larger pumps. The City engineer thought that whether the City could increase the pump capacity in that way without exposing the City to suit from residents downstream would be a legal question. Even with installation of the force main and portable pump, the City engineer believed that the Nathan Estates pond remains a retention pond rather than a detention pond because the water must travel uphill before it can flow to other areas.

The City's engineering consultant testified that the City could have reduced damage to the plaintiffs' houses by pumping more water out, but

he did not know if the City could have prevented the flooding entirely. Nor did he offer testimony about the feasibility of pumping during the 2019 flood.

The plaintiffs' expert witness ultimately concluded that the City's post-2019 efforts at the Nathan Estates pond had been good, but he believed that they should have been done sooner. In his opinion, because the City had notice that the soil beneath the pond had poor drainage quality, the City should have planned for an alternate means of diverting water out of the pond in the event of back-to-back storms or intense rain. His report acknowledged that he did not review any comprehensive plan for stormwater drainage for the area and, thus, did not see how this or surrounding sites should be designed or where water from the pond might be taken.

The parties focus much of their arguments on whether the plaintiffs may use the City's 2011 drainage manual at trial. The City argues that use of the manual is barred by substantive immunity. Neither side relies on the manual to support their arguments about municipal immunity under § 11-47-190. The manual is of questionable relevance. It was prepared and adopted in 2011 and applied to new development or

improvement projects. Thus, it did not apply to the Nathan Estates pond as originally constructed or to the City's 2005 improvements. Nonetheless, the manual's design standards for detention ponds require that they "attenuate the post development peak flow rates from the 2-year, 5-year, 10-year and 25-year NRCS 24-hour design storms to discharge at or below predevelopment peak flow rates." The manual's design standard for retention ponds states:

> "A retention basin should be sized so that the volume of the excavated material from the pond is equal to the difference between the pre-development and post-development runoff volume from the development. The volume calculation should be based on a 25[-]year 24[-]hour rainfall event. A 100[-]year 24[-]hour rainfall event should also be analyzed to ensure that no structures or roadways will be inundated."

### Standard of Review

> "A writ of mandamus is an extraordinary remedy, and it will be 'issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.' Ex parte United Serv. Stations, Inc., 628 So. 2d 501, 503 (Ala. 1993)."

Ex parte Empire Fire & Marine Ins. Co., 720 So. 2d 893, 894 (Ala. 1998).

Moreover,

20

"[i]n reviewing a trial court's ruling on a motion for a summary judgment, we apply the same standard the trial court applied initially in granting or denying the motion. Ex parte Alfa Mut. Gen. Ins. Co., 742 So. 2d 182, 184 (Ala. 1999).

> "'The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact.'

"742 So. 2d at 184. '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989)."

Swan v. City of Hueytown, 920 So. 2d 1075, 1077-78 (Ala. 2005). See Ex parte Price, 256 So. 3d 1184, 1186-87 (Ala. 2018). These standards apply in cases involving municipal immunity. See Ex parte City of Muscle Shoals, 257 So. 3d 850, 854-56 (Ala. 2018).

21

<u>Analysis</u>

The plaintiffs' pending claims against the City seek damages based on negligence and trespass.  The City argues that, under § 11-47-190, it is immune from suit on those claims.  That section provides:

"No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, or unless the said injury or wrong was done or suffered through the neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways, or buildings after the same had been called to the attention of the council or other governing body or after the same had existed for such an unreasonable length of time as to raise a presumption of knowledge of such defect on the part of the council or other governing body and whenever the city or town shall be made liable for damages by reason of the unauthorized or wrongful acts or negligence, carelessness, or unskillfulness of any person or corporation, then such person or corporation shall be liable to an action on the same account by the party so injured."

In <u>Ex parte City of Huntsville</u>, 399 So. 3d 1020, 1026 (Ala. 2024), we recently stated:

"This Court explained in <u>Ex parte City of Muscle Shoals</u>[, 257 So. 3d 850 (Ala. 2018),] that this statute has long been held to limit municipal liability to two situations.  257 So. 3d at 855.  First, municipalities may be liable for injuries caused by the wrongful conduct of their agents performed in the line of duty.  Second, municipalities may be liable for

22

injuries caused by their failure, upon notice, to remedy defects in public streets or buildings. Id."

Therefore, under § 11-47-190, the City may not be liable for the plaintiffs' injuries unless their claims fall within one of these two situations.

"[W]hen an issue of fact implicating whether immunity applies in a given case is disputed, then the issue may be submitted to a jury. …

"In the face of a properly supported motion for a summary judgment invoking the immunity expressed in § 11-47-190 … it is incumbent upon the nonmovant to present substantial evidence of 'neglect, carelessness, or unskillfulness' by a municipal agent, officer, or employee, or to present substantial evidence that the municipality had actual or constructive notice of a defect and failed to remedy it and that such negligence or defect caused the plaintiff's injuries."

Ex parte City of Muscle Shoals, 257 So. 3d at 856-57.

Section 11-50-50, Ala. Code 1975, authorizes municipalities to construct and maintain drainage systems. "[W]hile a municipality is not required to exercise this authority, once it does so, a duty of care arises and a municipality may be liable for damages proximately caused by its negligence." City of Mobile v. Jackson, 474 So. 2d 644, 649 (Ala. 1985). Moreover, this Court has held that "the liability for negligent design or maintenance of drainage systems is analogous to that involved in the

23

construction and maintenance of streets, alleys, or public ways or buildings." Id. It is undisputed that the City undertook control and maintenance of the Nathan Estates pond as part of its municipal stormwater-drainage system within its authority under § 11-50-50. Thus, either of the § 11-47-190 exceptions to municipal immunity may apply to the City's improvements to, and maintenance of, the pond.

The parties focus much of their arguments on whether the plaintiffs' claims are based on the City's alleged negligent maintenance of the pond or on its negligent design of the 2005 improvements. That is, they focus heavily on whether the plaintiffs' claims fall within the first or the second exception to municipal immunity. This distinction can be critical in cases involving statute-of-limitations problems. See, e.g., Reichert v. City of Mobile, 776 So. 2d 761 (Ala. 2000), and Long v. City of Athens, 24 So. 3d 1110 (Ala. Civ. App. 2009). However, no such issues have been raised here. Thus, we do not find the distinction to be critical to our analysis, as the parties suggest it is.

Most of the facts presented by the evidence are undisputed. The primary points of dispute are whether the Nathan Estates pond is a detention pond or a retention pond, what level of probability the

24

February 2019 rainfall event exceeded, and whether the pond had overflowed into the road before or after the City's 2005 improvements. We find that none of these factual issues are determinative of the question of municipal immunity. Thus, they do not present material questions of fact suitable for a jury to decide.

The plaintiffs' claims, for purposes of both § 11-47-190 exceptions, rest exclusively on the proposition that the City did not plan to pump water out of the Nathan Estates pond during heavy rainfall events. The question, thus, is whether the City may be held liable for planning only for small events, be that a failure of maintenance or of design.

The plaintiffs argue that City employees failed to regularly pump water out of the pond and failed to draw down the water level of the pond before the February 2019 rains. This, they say, was "neglect, carelessness, or unskillfulness" of City agents or employees for which the City may be held liable under § 11-47-190. None of the cases cited by the plaintiffs involved a failure to plan for heavy rainfall events. See Ex parte City of Muscle Shoals, 257 So. 3d at 850 (involving plaintiff injured by falling through grate at city park); Long v. Jefferson Cnty., 623 So. 2d 1130 (Ala. 1993) (involving house built directly over sewer; title

inspection failed to show county easement and sewer ultimately collapsed); Lott v. City of Daphne, 539 So. 2d 241 (Ala. 1989) (involving city modifications to drainage system that deliberately diverted water across plaintiffs' property, causing erosion); City of Mobile v. Jackson, 474 So. 2d 644 (Ala. 1985) (involving city permitting adjacent property to be raised, interrupting water flow on plaintiff's property and causing flooding); and City of Montgomery v. Patterson, 80 So. 3d 264 (Ala. Civ. App. 2011) (involving plaintiff being hit in head when faulty window covering fell at government-owned facility).

Moreover, the plaintiffs repeatedly make the point that the only means by which water may leave the Nathan Estates pond is by evaporation or infiltration into the surrounding soil. Whether it is a detention pond or a retention pond, it had no outlet through which City employees could pump water. It was not designed that way. Thus, pumping could not have been part of the City's regular maintenance of the pond.

The plaintiffs' expert witness offered no opinion about the City's maintenance of the Nathan Estates pond. A report prepared for the City after the February 2019 flood recommended drawing down water in the

pond as part of "maintenance" to prevent future flooding in heavy rainfall events. However, this was recommended after the City had laid pipe through which water could be pumped to Gum Bottom. The City employees who maintained the pond before that pipe was installed could not have acted neglectfully, carelessly, or unskillfully in failing to pump where no pipe existed through which they could have pumped water out of the pond. The question whether the pipe should have been installed sooner, thus altering the design of the Nathan Estates pond, relates not to maintenance, but to an alleged problem with the pond itself.

The parties focus their arguments heavily on whether there is evidence indicating that the City had notice of a defect in the pond after its 2005 improvements were completed. The City argues that evidence indicating that the Nathan Estates pond flooded before those updates were completed cannot be used to support the plaintiffs' claims. Only evidence of flooding after the date the improvements were completed, the City says, may be evidence of the notice necessary under the second § 11-47-190 exception.

The plaintiffs focus on the testimony of Amanda King. She stated that the pond flooded the roads so that they were impassable for several

27

days in 2005, after the City had completed its improvements. However, later in her deposition, she admitted that she did not know if that flooding happened before or after the improvements were done. The plaintiffs urge that her first testimony cannot be discounted. See Alabama Dep't of Revenue v. Greenetrack, Inc., 369 So. 3d 640 (Ala. 2022), and McGough v. G & A, Inc., 999 So. 2d 898 (Ala. Civ. App. 2008). The City says that the testimony is tenuous at best and is no proof that the City was on notice of a defect in the pond.

Whatever weight must be given to King's testimony, it is undisputed that the City used FEMA mapping and probabilities in its planning. Thus, it had notice that there were smaller chances of higher flooding in any given year, e.g., a 1% chance of a 100-year rainfall event. The City, likewise, would have had notice that there was some probability of back-to-back storms that would impact its stormwater drainage system.

At the Nathan Estates pond, the City determined to increase the pond's capacity as much as possible within the area available. This was done to prevent frequent flooding of the surrounding roads. The City used the industry standard 24-hour probabilities and worked within its

28

standards requiring mitigation measures capable of dealing with 25-year rainfall events in making the improvements. The City did not design the pond or make any plans for protecting the plaintiffs' houses in cases of larger, less probable rainfall events. The material question is whether the City may be held liable for that decision, i.e., whether that decision led to a negligent design that created a defect in the pond.

The plaintiffs argue that the failure to plan for smaller probability, higher magnitude rainfall events creates a defect in the pond. Their expert witness testified that all ponds in a stormwater drainage system should have some outlet by which water can leave the pond besides evaporation or infiltration. He stated that the City could have done something -- but he did not know what -- to plan for smaller probability rainfall events before they happened. The City counters that the Nathan Estates pond is a retention pond that, by definition, does not have a positive outlet and often holds pools of water. The pond thus operates as designed.

Our cases say that negligent design can form the basis of municipal liability. See City of Mobile v. Jackson, 474 So. 2d at 649. However, the determinative question in this specific case seems not to involve a fault

in the design itself, but the City's choice in how to plan. The question is whether the City may be held liable for planning only for 25-year rainfall events at the Nathan Estates pond. This question involves broader issues regarding the City's policy choices about whether to plan for smaller probability floods, the effect on adjacent landowners, and annexation problems. These issues touch on broader questions involving the City's stormwater-drainage system as a whole and questions involving other City residents, not just these plaintiffs.

These questions touch on issues of substantive immunity, as the City suggests. See Rich v. City of Mobile, 410 So. 2d 385 (Ala. 1982). However, we need not address them here. The plaintiffs' expert witness testified that it was within standard practice for municipalities to plan only for 2- to 25-year rainfall events. He identified a growing trend among municipalities to require mitigation measures capable of dealing with of 100-year rainfall events. However, he testified that, at the time of the City's improvements to and maintenance of the Nathan Estates pond, the City's standards required mitigation measures capable of dealing with 25-year rainfall events. Thus, according to his testimony,

the City's decision to plan for only 25-year rainfall events was within common municipal practice.

The evidence produced did not show that the City breached any duty it might have by failing to plan for larger, less probable rainfall events. Thus, it does not show that City employees or agents acted with "neglect, carelessness, or unskillfulness" in designing those improvements or maintaining the pond as required by § 11-47-190. Likewise, the evidence does not show that the City's design of improvements to the Nathan Estates pond was outside common practice and defective within the meaning of the term "defect" in § 11-47-190. Thus, the municipal immunity of § 11-47-190 applies to bar the plaintiffs' claims for damages against the City.

Because the plaintiffs' claims for damages are barred by § 11-47-190, we have no need to address the City's argument that the plaintiffs are barred by principles of substantive immunity from using the City's drainage manual at trial to establish the City's standard of care.

31

Conclusion

Based on the foregoing, we grant the City's petition and issue the writ directing the trial court to enter a summary judgment for the City regarding the plaintiffs' negligence and trespass claims.

PETITION GRANTED; WRIT ISSUED.

Stewart, C.J., and Shaw, Wise, Mendheim, Mitchell, Cook, and McCool, JJ., concur.

Sellers, J., concurs in the result.